[Civ. No. 13674. First Dist., Div. One. June 17, 1948.]

JOHN DALAKIS, Respondent, v. CALIFORNIA PARAS, Individually and as Executrix, etc., Appellant.

244

David Rubenstein and Carroll B. Crawford for Appellant.

Chas. N. Douglas and John A. Hodges for Respondent.

WARD, J.—This is an action to enforce a trust. Defendant California Paras individually, and as the executrix of the estate of her husband William Paras, appeals from a judgment in favor of plaintiff John Dalakis for $2,350, plus interest and costs. Primarily the appeal involves the question of the sufficiency of the evidence to uphold the findings, and a determination of the nature and character of a trust.

The complaint alleges that prior to the death of William

Paras, plaintiff and the deceased were friends and that great confidence existed between them "and plaintiff trusted deceased implicitly and as a result thereof delivered to said William Paras money and other properties, to wit: Ten (10) One Hundred Dollars ($100.00) War Bonds; a watch with a gold chain, and the sum of . . . ($2350.00) in cash, to be cared for by said William Paras for plaintiff." The return of the bonds and watch is alleged, but defendants' failure to return $2,350, although demand was made repeatedly after the death of William Paras, is also set forth.

Answers of California Paras as executrix and individually were filed, setting forth "That on or about the 16th day of August, 1944, plaintiff filed with this answering defendant as Executrix . . . his claim for . . . ($2,350.00), which plaintiff alleged was due him from said estate; that on September 15, 1944, said claim was rejected by this defendant in her capacity of Executrix because it was unaccompanied by proper vouchers or proof of its validity . . ." and "that said cause of action is barred by the terms of Section 714 of the Probate Code of the State of California." Defendant, individually, denied "that at any time or place or at all this defendant ever had or now has possession or control of any money . . . belonging to plaintiff, or that she has ever been a party to the withholding of plaintiff's money and/or personal property by others."

Defendants do not urge that Probate Code, section 714, as to suits on rejected claims is applicable, and the propriety of plaintiff's testimony in view of the provision of Code of Civil Procedure, section 1880(3) is not mentioned on appeal although certain objections based thereon appear in the record. These questions may be disregarded. Probate Code, section 714 is not involved (*Elizalde* v. *Elizalde,* 137 Cal. 634 [66 P. 369, 70 P. 861]), and Code of Civil Procedure, section 1880(3) does not control where it is sought to establish a trust (*Holland* v. *Bank of Italy Nat. T. & S. Assn.,* 115 Cal.App. 472 [1 P.2d 1031]; *Coombs* v. *Minor,* 60 Cal.App. 2d 645 [141 P.2d 491]).

William Paras, known as Bill, and his three brothers ran a grocery store and butcher shop under the name of "Cosmopolitan Market." George Dyer who was acquainted with both plaintiff and Bill, stated that he knew the latter was holding money for his countryman, and that plaintiff offered him the use of a sum of money which "was in the keeping

of Mr. Paras." Charles Small, accountant for the Cosmopolitan Market, testified that the market kept an account at the Market and Geary Street branch of the Bank of America, but that for a short time there had been another account in the name of William Paras. The latter account was opened in November of 1943; when the statement came in Small discussed the matter with the deceased as follows: "The statement came in with the statement of the Market at the end of the month and I handed the statement to him. Later on that afternoon, he gave me the statement back and he asked me if I would keep it in my office for him, that he was holding some money for some people." Similar testimony was brought out upon questioning by the court. Plaintiff's pass book for his bank account with the Bank of America served to support his testimony concerning his financial practices. It was opened August 7, 1941, and thereafter periodical deposits of $40 or $50 were made. On January 20, 1943, it amounted to $1,393.63. No further deposits were made until May 18, 1944. Plaintiff testified that in the interim period of about 15 to 16 months "I have been working and here is the receipts of the moneys I have been receiving from my employer, plus the tips that I was making. All this money I was leaving with this gentleman that died, my friend, Mr. Paras." The withdrawal of $393.63 which appeared in the pass book under date of February 23, 1943, he explained as enabling him to purchase some of the war bonds which Bill held for him. He testified that he resumed making deposits in the bank on May 18, 1944, as at that time Bill was "out for a couple of weeks, I think, so at that time I was compelled to go to the bank, because I don't want to carry that money in that neighborhood, so I put it in the bank. Then ten days after that, the gentleman died." The date of death is May 27, 1944. Prior to making the deposit of May 18, 1944, and when Bill went on his vacation, plaintiff gave Nicholas Paras an envelope containing $100, saying, "This is $100, Nick, and I want you to give it to Bill, if you please." Nicholas admitted the receipt of an envelope from Dalakis which was delivered to Bill, but the envelope was sealed and Nicholas testified: "I don't know what they had in it and I don't know what they had in the safe."

Plaintiff testified that the day before his death Bill Paras discussed the amount Dalakis had delivered to him for safekeeping; that there was a misunderstanding whether the sum amounted to $2,300 or $2,350 and that Bill had promised

to check the amount. Dalakis testified that his money was safer in the hands of Bill than in a bank. Dalakis assumed that Bill had deposited the money in a bank as he had said that he would give him a check on the bank to get it out. Dalakis further testified that it was not safe in the part of town that Paras and Dalakis worked to leave the neighborhood at night with money on the person. Dalakis worked as a waiter and claimed that tips averaged in one place $5.00 and in another $10 a day in addition to his salary and various amounts he won playing cards. A cousin of plaintiff testified that Bill admitted to him that he was holding war bonds and money for Dalakis.

Plaintiff testified that 39 days after Mr. Paras' death he called Mrs. Paras and asked, " 'Do you happen to know that Mr. Paras, your husband, left any money in there, any receipts, or anything, to show, did he ever notify you about holding any money for me, because he is holding $2350 for me and some bonds and a watch . . . I got the bonds and watch, but the money they told me they don't know anything about it down there, and I am asking you if you please look around and see if you find any receipt that shows he holds money for me.' " She answered, " 'I have heard of this. I have looked everywhere, trying to locate something, under carpets and everywhere, but I didn't find anything at all.' " Plaintiff testified that he told her that Small knew something about the matter and that she answered, " 'If Mr. Small knows anything about this, statement come from the bank to show he did hold money for you, we will see about that.' "

California Paras was called under Code of Civil Procedure, section 2055. It was stipulated that at her husband's death there was an account at the Bank of America, Market and Geary branch, in his name, showing a balance of $2,732.76. In her own behalf Mrs. Paras testified that after her husband's death she received two telephone calls from plaintiff. On the first call he told her that "he gave my husband some bonds, his watch and the amount of around a thousand dollars to hold it for him." She recounted their conversation; that she told him "he should have put his money into the bank," and "I asked him if he has any note with my husband's signature on it to prove Mr. Dalakis did really gave money to my husband, and the watch and the bonds"; that Mr. Dalakis replied " 'I gave him that money and bonds and watch, to put it in the safe.' " The second call occurred

just before plaintiff filed suit and this time plaintiff used the figure $1,600 as the amount claimed. She testified that she never knew of nor received from her husband prior to his death any of the funds plaintiff claimed were deposited with him. He never told her he held money for anybody.

The objections to the findings are based on rather technical grounds. The findings appear by reference to the pleadings. The complaint alleges: ". . . and in this connection, plaintiff alleges that said defendants cooperating with the defendant California Paras took possession of the personal property of plaintiff herein described and have ever since May 27, 1944, refused to deliver the said property of plaintiff to the plaintiff herein." It is true that California Paras took possession of the property, but that she cooperated with other defendants is surplusage. The other defendants were fictitious. Two "Does" were mentioned in the complaint, but at the outset of the trial a dismissal was entered as to fictitious defendants. The evidence shows that other sums than $2,350 were mentioned by Dalakis covering statements made to certain witnesses. These statements covered different periods of time, but there is substantial evidence that the amount was $2,350. Defendants object to other findings (following the exact language of the complaint) on the ground that there is no evidence or no credible evidence to sustain them. The findings are certain in that $2,350 was delivered by Dalakis to William Paras to be held in trust. These two findings sufficiently support the complaint.

Whether evidence measures up to the standard required to constitute a trust should be determined by the trial court. Reviewing courts should not interfere except where there is an apparent legal deficiency in evidentiary support.

In the present case a fiduciary relationship was pleaded and the trial court found such allegation true. The record reveals corroboration for plaintiff's testimony of friendship between himself and William Paras, and a relationship of confidence is disclosed. That friendship is sufficient to show a fiduciary relationship. (25 Cal.Jur., pp. 129-130, 162-164; *Coombs* v. *Minor, supra,* 652.) There is other evidence which the trial court believed which is sufficiently convincing to establish a trust in the absence of legal deficiency in the evidence.

The present case does not involve the question of the rights of creditors or of a mingling of separate property with community property or the conversion of trust funds into

other kinds of property. The trust fund in this case was sufficiently identified by the accountant of the Cosmopolitan Market. The circumstances by uncontradicted evidence point to the particular fund wherein Paras deposited the money of Dalakis. The fact that a greater amount was found in the particular fund than Dalakis had entrusted to Paras does not negative the conclusion that $2,350 of the whole amount was the property of Dalakis. The fact that a greater amount was found in this particular bank account supports the conclusion that the trust fund was intact. (*Elizalde* v. *Elizalde, supra.*) The money was sufficiently traced (*Byrne* v. *McGrath,* 130 Cal. 316 [62 P. 559, 80 Am.St.Rep. 127]; *Mitchell* v. *Dunn,* 211 Cal. 129 [294 P. 386]) and therefore the beneficiary is not a general creditor.

█ The necessary proof of a relationship of trust and confidence having been made with respect to William Paras, and there being the additional proof of plaintiff's deposit of $2,350 with Paras under an oral agreement that Paras was to hold it for plaintiff's benefit, it must be concluded that the evidence establishes a "voluntary trust" in which William Paras was "voluntary trustee," and plaintiff, beneficiary. █ Upon the death of William Paras, California Paras as administratrix must be held accountable to plaintiff in the amount of $2,350. (See *Humes* v. *Humes,* 56 Cal.App.2d 126 [133 P.2d 39].) In her individual capacity California Paras, as one who would be unjustly enriched by the personal retention of the fund, is an involuntary or constructive trustee of the fund for the benefit of the owner John Dalakis. (Civ. Code, § 2223.) "On the occurrence of death of the trustee, the title of the property passes, in the case of real estate to the trustee's heir, and in the case of personalty to his executor or administrator. The trustee's successor holds the property in the same manner as did the decedent, and hence it is not to be considered as assets of the latter's estate. But, while the title thus passes to the trustee's successor, the right to administer the trust appertains to the individual; it is not descendible, devisable or alienable, and the successor is not to be held responsible on the theory that he assumed the duties of administration. He is, it seems, in the position of an involuntary trustee." (25 Cal.Jur., p. 331.)

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.